UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| STEVEN J. RADEL,<br><br>                     Plaintiff,<br><br>      vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                  Defendant. | 4:19-CV-04068-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Steven J. Radel, seeks judicial review of the Commissioner's

final decision denying his application for social security disability benefits

under Title II and Title XVI of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Mr. Radel filed his application for both types of benefits. AR11, 199, 203, 242, 257, 262. His coverage status for SSD benefits expires on December 31, 2020. AR13. In other words, in order to be entitled to Title II benefits, Mr. Radel must prove disability on or before that date.

Mr. Radel has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to remand the matter to the Social Security Administration for an award of benefits or for further proceedings. The government requests the Commissioner's decision be affirmed.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from plaintiff, Steven J. Radel's ("Radel") Title II and Title XVI applications filed on February 25, 2016, alleging disability since October 1, 2015, due to a short right arm, deformed fingers on the right hand, mental illness, depression, anger and traumatic brain injury. AR11, 199, 203, 242, 257, 262.

Mr. Radel's claim was denied initially and upon reconsideration. AR11, 155, 163, 170. Mr. Radel then requested an administrative hearing. AR11, 177.

Mr. Radel attended an administrative hearing on June 4, 2018, before Administrative Law Judge ("ALJ") Hallie Larsen. AR11, 70, 72. At the hearing,

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 12). The court has made only minor grammatical and stylistic changes.

Mr. Radel was represented by Thomas Johnson, counsel other than the undersigned counsel. Following the hearing, ALJ Larsen issued an unfavorable decision on August 28, 2018. AR8, 11-23.

At Step One of the evaluation, the ALJ found that Mr. Radel was insured for benefits through December 31, 2020, and that he had not engaged in substantial gainful activity ("SGA") since October 1, 2015, the alleged onset of disability date. AR13.

At Step Two, the ALJ found that Mr. Radel had severe impairments of major depressive disorder, generalized anxiety disorder, traumatic brain injury, and congenital deformity of the right upper extremity; finding that these medically determinable impairments significantly limited Mr. Radel's ability to perform basic work activities. AR14.

The ALJ found that Mr. Radel also alleged additional impairments and the record showed that Mr. Radel had received treatment or been evaluated for other symptoms and complaints, but stated that the alleged impairments "caused only transient and mild symptoms and limitations, are well controlled with treatment, have not met the 12-month-durational requirement, or are otherwise not adequately supported by the medical evidence in the record." AR14. The ALJ concluded "these alleged impairments do not constitute severe medically determinable impairments." AR14. The ALJ stated, "These include, but are not limited to, the following: polysubstance abuse (in remission)." AR14.

At Step Three, the ALJ found that Mr. Radel did not have an impairment that met or medically equaled one of the listed impairments. AR14. The ALJ found that Mr. Radel's mental impairments caused moderate limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations with concentration, persistence or maintaining pace, and moderate limitations in adapting or managing oneself. AR15.

The ALJ determined that Mr. Radel had the residual functional capacity ("RFC") to perform:

> medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently. The claimant can stand and/or walk for 6 hours in an 8-hour workday with normal breaks and sit for 6 hours in an 8-hour workday with normal breaks. The claimant can frequently push and/or pull with the right upper extremity. The claimant can occasionally climb ladders, ropes, or scaffolds, and occasionally reach overhead and handle and finger with his right non-dominant upper extremity. The claimant is able to understand, remember and carry out short, simple instructions. The claimant is able to interact appropriately with coworkers and the general public on an occasional basis. The claimant is able to respond appropriately to work pressures in a usual work setting. The claimant is able to respond appropriately to changes in a routine work setting.

AR16.

The ALJ's subjective symptom finding was that Mr. Radel's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of his symptoms were not "entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision." AR19.

The ALJ noted in her decision that the record contained global assessment of functioning ("GAF") scores, citing Exhibit 1F, and gave those assessments minimal weight. AR20.

The ALJ considered the opinion of consultative examiner Nicholas VenOsdel, M.D., who the ALJ noted had opined that Mr. Radel had limitations in his ability to finely manipulate with his hands and fingers due to his congenital abnormality of his right upper extremity, and limitations in his ability to lift and reach overhead with that extremity. AR20. The ALJ noted that Dr. VenOsdel opined that Mr. Radel had no limitations in lifting and carrying or with walking, standing, or sitting. AR20. Ultimately, the ALJ gave Dr. VenOsdel's opinion great weight. AR20. The ALJ stated that the consultant's exam was the only thorough physical exam in the record and was consistent with Mr. Radel's allegations. AR20.

The ALJ also considered the opinions of the State agency psychological consultants, Doug Soule, Ph.D., and Jerry Buchkoski, Ph.D., who found no severe impairments and completed no RFC assessment and gave their opinions little weight. AR21. The ALJ noted Mr. Radel had complained of anger and depression affecting his ability to work and he had received therapy and counseling. AR21.

The ALJ considered the opinions of the State agency medical consultants, James Barker, M.D., and John Lassegard, M.D., and gave them

"some weight" because the consultants' opinions that Mr. Radel could perform light exertion work was inconsistent with Mr. Radel's allegations and the results of the physical consultative exam.  AR20.

At Step Four, based on her RFC determination, the ALJ found that Mr. Radel was not capable of performing his past relevant work.[3]  AR21.

At Step Five, the ALJ found Mr. Radel capable of adjusting to other work that existed in significant numbers such as laundry worker, DOT #361.685-010; usher, DOT #344.677-014; and page, DOT #353.367-022, relying on testimony from the vocational expert ("VE").  AR22.  The ALJ noted the VE testified that regarding the upper extremity limits, her testimony was based on her professional experience.  AR22.

Mr. Radel timely requested review by the Appeals Council and submitted additional evidence dated October 23, 2018, from Tom Audet, C.R.C.  AR64-65, 197.  Specifically, the additional evidence was a consultative vocational report that Mr. Audet sent to Mr. Radel's attorney.  AR54-65.  In the report, Mr. Audet explained that he administered the Purdue Pegboard test due to Mr. Radel's upper right extremity congenital deformity.  AR64.  The test revealed scores in the 1st or 2nd percentile for every test involving Mr. Radel's right hand.  AR64-65, 197.

---

[3] The ALJ recited in its opinion that the vocational expert ("VE") testified Mr. Radel could not return to his past relevant work.  AR21.  Not exactly.  The VE testified Mr. Radel *could* return to driving dump truck, but could not return to construction work generally.  AR93.  Despite the mis-citation to the VE's testimony, the ALJ's conclusion was that Mr. Radel could not perform past relevant work.  AR21.

Mr. Radel also submitted Mr. Audet's curriculum vitae, which described Mr. Audet's work with the Social Security Administration and his testimony as a vocational expert in over 5,000 cases. AR66-69.

The Appeals Council denied Mr. Radel's request for review, making the ALJ's decision the final decision of the Commissioner. AR1-7. When denying Mr. Radel's request for review it stated that the result of the Perdue Pegboard test obtained on October 23, 2018, "does not relate to the period at issue" and "does not affect the decision about whether you were disabled beginning on or before August 29, 2018." AR2. The Appeals Council also explained that Mr. Radel could file a new application for disability. AR2.

## B. Plaintiff's Age, Education and Work Experience

Mr. Radel was born in July of 1965 and completed the 12th grade in 1984. AR199, 243. The ALJ found that Mr. Radel had past relevant work as a construction worker and a dump truck driver. AR21.

## C. Medical Evidence of Record

### 1. Consultative Examination

Mr. Radel was sent for a consultative physical exam performed by Nicholas VenOsdel, M.D., on December 17, 2016. AR488. Dr. VenOsdel noted allegations related to Mr. Radel's arm, depression, traumatic brain injury, and headaches. AR488-89. Mr. Radel was born with a congenital defect in his right arm due to thalidomide syndrome[4] resulting in a shortened right arm and

---

[4] When an individual is born with phocomelia (hands or feet attached close to the trunk), due to drugs or pharmaceuticals, it is known as thalidomide syndrome. The symptoms of thalidomide syndrome are defined by absent or

syndactyly (webbed or conjoined digits) of his right fingers requiring surgical separation. AR488.

Mr. Radel also has only three digits on the right hand and he reported that the tendon on the third digit occasionally gets stuck. AR488. Mr. Radel reported brain injuries, first from an automobile accident at age 6, and again when hitting his head on the bottom of a swimming pool at age 11. AR488. Additionally, Mr. Radel reported he had a history of depression but acknowledged that his medication was working well to control his symptoms. AR488. Mr. Radel also noted he had no history of musculoskeletal or joint pain. AR489.

Dr. VenOsdel's exam revealed that Mr. Radel was well-developed, well-nourished, and in no acute distress. AR490. Mr. Radel admitted that he was currently working part-time at Hardee's and acknowledged he could dress and feed himself and perform chores such as sweeping, mopping, cooking, shopping, washing dishes and mowing the yard. AR489. Mr. Radel had no difficulty with ambulation. AR490. Mr. Radel's exam revealed he had significant shortening of the right upper extremity in both the humeral, radial and ulnar aspects of the arm and forearm; only three digits on the right hand with significant stunting contractures and shortening of the digits; clubbed nails of the digits; fingers could be fully flexed, but none could be fully extended; and muscle bellies of the right upper extremity were significantly

---

shortened limbs; causing flipper hands and feet. <u>See</u> https://en.wikipedia.org/wiki/Phocomelia. All internet citations in this opinion were last checked December 17, 2019.

smaller than the left extremity.  AR490.  Dr. VenOsdel explained there was no sign of amputation of the right hand and the condition was felt to be congenital abnormality.  AR490.  Overall, Mr. Radel had 5 out of 5 grip strength bilaterally.  AR490.

During a neurological examination of Mr. Radel, Dr. VenOsdel observed that Mr. Radel had 5 out of 5 motor strength in his upper and lower extremities and intact sensation.  AR491.  Dr. VenOsdel also found that Mr. Radel had difficulty with fine manipulation of his right hand with holding paper and positioning paper while writing with his left, dominant hand.  AR491.

Dr. VenOsdel's impressions regarding Mr. Radel's arm problem was that he did have objective findings consistent with limitations, Mr. Radel's three digits of the right hand were limited in their ability to function as they are shortened and contractures limit the ability to extend them, and objective findings demonstrated Mr. Radel had limitations in his ability to fine manipulate with his right hand.  AR491.  Dr. VenOsdel stated Mr. Radel also had limitations in his ability to lift and reach objects overhead because of his right upper extremity abnormality, and should not be expected to lift "heavy objects up over his head."  AR492.  Dr. VenOsdel stated Mr. Radel had no limitations with "…basic handling of objects that [did] not require fine manipulation with hands or fingers."  AR492.  Dr. VenOsdel's report included a definition key "occasionally," "frequently," and "continuously" but he did not use any of those terms to quantify the limitations he identified.  AR492.

Dr. VenOsdel found no limitations with respect to Mr. Radel's depression, traumatic brain injury ("TBI") or alleged headaches.  AR491.

## 2. Treatment Records from Volunteers of America

Prior to the relevant period, Mr. Radel was seen at Volunteers of America for an initial psychiatric evaluation on June 2, 2015, due to grief over the loss of his wife in September, 2014, who died due to alcoholism-induced liver failure.  AR312.  Mr. Radel rated his life as an 8 out of 10 and was diagnosed with an adjustment disorder with disturbance of emotions and conduct. AR312.  Overall, Mr. Radel was assigned a GAF score of 75.  AR312.

On follow-up, Mr. Radel was seen again at Volunteers of America for therapy in July, 2015.  AR314.  Mr. Radel appeared more stable and at peace. AR314.  Mr. Radel was working and also playing drums and bass and had been "jamming" with a few different musicians and he said he was putting a CD together with a band over the 4th.  AR314.  Mr. Radel's GAF score remained a 75.  AR314.

## 3. Avera Medical Group Records

Mr. Radel was seen at Avera University Psychiatry by Xiaofan Li, M.D., on April 11, 2016, for an initial assessment for anxiety, anger, and impulsivity problems while he was an inmate in jail since March 17, 2016.  AR463.  He needed an initial evaluation due to a reported history of a TBI from a moving vehicle accident resulting in being in a coma for 3.5 weeks when he was young. AR463-65.  Mr. Radel denied any recent hospitalizations and acknowledged that he was not taking medications.  AR464.  Mr. Radel denied significant

depression but reported some anxiety, which the examiner stated may be related to him being in jail for burglary because he feel asleep in a lady's house while intoxicated. AR464. Mr. Radel was diagnosed with a TBI with anger and impulsivity, an anxiety disorder, and a prior substance use disorder (methamphetamines). AR465. Overall, Mr. Radel was found not to be a danger to himself or others and was started on Depakote. AR465. Mr. Radel returned to see Dr. Li on June 29, 2016. AR457. Mr. Radel reported some improvement of his anger and impulsivity with medication. AR458-59. Mr. Radel reported that he was still feeling depressed. AR457.

On July 28, 2016, Mr. Radel saw Dr. Li again and reported an anger outburst and conflict with other inmates in his cell block. AR451. Mr. Radel also reported being depressed and his Depakote dosage was increased and Celexa prescribed. AR452.

In September, 2016, Dr. Li saw Mr. Radel again for follow-up treatment. AR444-48. Mr. Radel reported that things were going well and that he may be transferred to a halfway house. AR444. Mr. Radel admitted that medication had helped his anger and impulsivity, as he denied any anger outbursts or aggression since July, 2016, but he felt his medication may be too sedating. AR444. Mr. Radel also denied any depression. AR444. All in all, Mr. Radel was "doing well" as he was cooperative with intact cognition and full affect. AR445-46.

In February, 2017, Mr. Radel returned to Dr. Li and continued to be managed with outpatient treatment. AR495-97. Mr. Radel was "doing well," he

was staying in a halfway house, attending an IOP program, and he reported his anger and impulsivity were improving, but he wanted a lower dose of his medication. AR496. Mr. Radel reported he slept from midnight to 7:00 a.m. and then slept a lot during the day and felt his medication may be contributing to his fatigue. AR495. Mr. Radel was instructed to return in three months. AR496-97.

Mr. Radel returned to Dr. Li for treatment on May 17, 2017. AR534-36. Mr. Radel's mother provided a letter that informed Dr. Li that Mr. Radel had recently had an anger outburst at his mandatory anger management group and had been kicked out and she wondered about his medication compliance, and also about possible inpatient treatment. AR534. At his examination, Mr. Radel reported conflicts with a police officer, problems with his probation officer, and that he had stopped his Depakote two weeks prior because it made him very tired. AR534. Mr. Radel continued to take Celexa and reported feeling depressed for several months. AR534. Mr. Radel also reported a conflict with his parents but denied getting kicked out of his anger management group. AR534. Dr. Li concluded that Mr. Radel was not an imminent danger to himself and others and suggested continued outpatient treatment. AR536. Specifically, Dr. Li prescribed Risperidone and instructed Mr. Radel to discontinue using Depakote. AR536.

Mr. Radel continued his psychiatric treatment at Avera University Psychiatry in July, 2017. AR528. Mr. Radel reported that Risperidone was working better than Depakote with few side effects. AR528. He explained it

helped his anger and denied any major issues since his last visit. AR528.

Upon examination, Mr. Radel had a good mood, full affect, intact cognition, and his insight and judgment were "limited to fair." AR529. Mr. Radel continued to deny any depression and reported not much anxiety. AR528-29. Mr. Radel reported he was "doing much better" since he began taking Risperidone. AR530. Dr. Li found Mr. Radel was not an imminent safety concern and suggested that he return for follow-up treatment in two months. AR530. Mr. Radel was in "moral recognition therapy" and in after-care treatment, and his probation officer wanted him to attend anger management. AR528.

In August, 2017, Mr. Radel returned to Dr. Li and denied any depression or anxiety, but reported feeling tired all the time. AR522. Mr. Radel noted that his medication was helping his mood and denied having any side effects from medication. AR522. Mr. Radel also denied any aggression and only noted minimum irritability. AR522. Mr. Radel reported he was working 20 hours a week on a painting job and also played in a band. AR522. Mr. Radel's insight and judgment were "limited to fair." AR523.

In September, 2017, Mr. Radel was seen for a general physical examination. AR558. Joseph Seurer, M.D., with the Avera Medical Group found Mr. Radel to be pretty healthy. AR558-62. Mr. Radel reported his mood was good due to his treatment and noted he was working to remodel a house for a friend. AR558. All in all, Mr. Radel's only concern was fatigue. AR558. Dr. Seurer ordered laboratory testing, which resulted in "reasonable" results that did not reveal a cause for fatigue. AR573.

In November, 2017, Mr. Radel was seen by David Schlagel, M.D., with the Avera Medical Group for Psychiatry to establish care with a new psychiatrist for his depression and anger. AR550. Mr. Radel explained his medication had given him "a lot of benefit." AR550. He noted he has had a definite improvement with his anger and irritability but not a complete resolution. AR550-51. Mr. Radel stated he is currently seeing a probation officer and is playing in the band, The Zero Men. AR551-52. Dr. Schlagel found Mr. Radel's symptoms to be under "pretty good" control and suggested continued medical management. AR552-53.

In January, 2018, Mr. Radel returned to see Dr. Schlagel. AR545. Mr. Radel was doing well with no trouble with anger control. AR545-46.

In April, 2018, Mr. Radel saw Dr. Schlagel again for medical management of his symptoms. AR540. Mr. Radel noted that he continued to do well, and Dr. Schlagel found his symptoms remained under "good control." AR540-41. Upon examination, Mr. Radel was polite, friendly and cooperative and made good eye contact. AR540. Mr. Radel had a full affect and smiled easily. AR541. Mr. Radel was also fully oriented and had intact attention span, memory and judgment. AR541. Mr. Radel reported he had tried working at the Dollar Store doing overnight stocking but it was too physical. AR540.

**D.    State Agency Physicians' Opinions**

Dr. James Barker, the state agency physician consultant at the initial level, found that Mr. Radel had severe "fracture of upper limb" and non-severe organic brain syndrome. AR106. Dr. Barker found Mr. Radel could

occasionally lift 20 pounds and frequently lift 10 pounds, and that push/pull with the right upper extremity was limited to frequent. AR108-09. Dr. Barker also found Mr. Radel had unlimited ability to reach but was limited to occasional handling and fingering with his right hand. AR109-10. Dr. John Lassegard, the state agency physician at the reconsideration level, made identical findings. AR133, 135-36.

Dr. Doug Soule, the State agency psychological consultant at the initial level, found that Mr. Radel's alcohol and substance abuse disorder and anxiety disorder were not severe impairments, so no psychological RFC assessment was completed. AR106-07. Overall, Dr. Soule found that Mr. Radel only had mild functional limitations. AR107. Dr. Jerry Buchkoski, the state agency expert at the reconsideration level, made the same findings. AR133-34.

**E.      Testimony at the ALJ Hearing**

**1.      Mr. Radel's Testimony**

At the June 4, 2018, administrative hearing, Mr. Radel testified he was currently 52 years old and acknowledged that he earned a high school diploma. AR76. Mr. Radel reported his last job was Dollar Tree stocking shelves and the job lasted less than four weeks because he was told he was not keeping up with the quota, or wasn't fast enough. AR77, 88. Mr. Radel reported prior to that job he had worked at Hardee's for about four months for about three hours per week and he couldn't keep up with the rapid pace of orders and he was stressed out. AR77. Mr. Radel explained he would get flustered at Hardee's if someone would come back because he had left off cheese or not

made it the way it was supposed to be and he would get angry and want to leave, and over the four months he worked there he did leave probably four or five times due to anger issues. AR88. Mr. Radel explained he would not make a burger correctly because he was trying to keep up with the required speed. AR89.

Mr. Radel also testified he worked for Tom Kruger Excavating for fourteen years. AR78. Mr. Radel testified that Tom Kruger was a special person in his life and he met Tom, the owner of the excavating company, when he was 16. AR87. Mr. Kruger was the junior football coach for Mr. Radel's little brother's team, and when Mr. Radel applied for a job four or five years later Mr. Kruger recognized him and gave him the job. AR87. When asked what his job typically was at Kruger, Mr. Radel stated, "Lots of times you'd have to go out and mold out at the ranch and just do yard work. But drive trucks to the job site, pack dirt with compaction. That was pretty much pump watch, fill the pumps with sheet – I mean, refueling the pumps and checking oil and -- ." AR78. When the ALJ said, "And you drove a dump truck as well," Mr. Radel responded, "Yes. Several times. Almost every day." AR78. Mr. Radel was asked if Tom Kruger would do things for Mr. Radel that he didn't for the other employees and Mr. Radel said sometimes his job at the excavating company was to "pick weeds in the rose garden" at Mr. Kruger's house. AR87. Mr. Radel stated, "That was one typical job. If he was having problems finding me something to do that's what he would send me out to do." AR87. When asked if Mr. Kruger was having problems finding something for Mr. Radel to do

because there were some jobs he couldn't do, Mr. Radel said "Well, like cutting pipe or shoring up the walls, yeah." AR87. Mr. Radel said the job ended when Mr. Kruger, his wife and their son all died within a few months and their company went out of business. AR78. Mr. Radel explained he would still be doing this job if the company had not closed. AR78-79.

Mr. Radel testified that his anger outbursts and anxiety caused him to be sent home from work at Kruger's four or five times over the last six months when he worked there if he "sounded too much anxiety." AR86. Mr. Radel testified he had problems getting along with his coworkers. AR86. Mr. Radel testified he started mental health treatment that improved his ability to get along with others and helped to control his anger. AR85-86.

Mr. Radel testified he is left-handed and noted he doesn't have normal grip with his right hand, estimating it to be half compared to his left. AR81. He alleged he could not pick up a can of pop with his right hand. AR81.

### 2.    Vocational Expert Testimony

The VE testified that Mr. Radel's past job was a dump truck driver, DOT #902.683-010, and his work "helping someone remodel sheet rock and painting" was construction worker I. AR92.

The ALJ asked the VE a hypothetical that incorporated the limitations identified in the RFC and the VE testified the individual would not be able to perform Mr. Radel's past work as a construction worker, but could perform the dump truck driver position. AR93. The VE said they could also perform the

occupations of laundry worker II, DOT #361.685-010, usher, DOT #344.677-014, and page, DOT #353.367-022. AR94.

The VE testified her testimony was consistent with the DOT except the overhead reaching which is not addressed in the DOT and she based her opinion on her years of experience, observation of the jobs, and placing people within those occupations. AR95-96. The ALJ then asked whether these jobs involved bilateral occasional handling and fingering or was that based on her experience, and the VE stated it was based on her experience then said actually the usher and page jobs are occasional bilateral reaching, handling and fingering. AR96.

The VE also testified that an individual could be off task throughout the day no more than 10% of the time, and leave early, be late or absent less than one time per month to be competitively employed. AR97.

**3.    Other Evidence**

On October 23, 2018, almost two months after the ALJ issued her unfavorable decision on August 28, 2018, Thomas Audet, C.R.C., a VE with extensive experience testifying as an expert for Social Security disability hearings, completed a vocational report based on a Purdue Pegboard testing[5] that he administered on October 11, 2018. AR64-69. Mr. Radel's attorney submitted this evidence to the Appeals Council. AR1-2.

---

[5] This testing measures manual dexterity and bimanual coordination according to Mr. Audet.

Based on Mr. Audet's testing, all test scores involving Mr. Radel's right upper extremity scored in the 1st or 2nd percentile. AR64. Mr. Audet noted that Mr. Radel's scores were significantly below average compared to industrial applicants and suggests he would not be competitive in performing assembly or work tasks that involve manual dexterity, bimanual coordination, and fine finger dexterity. AR64. Mr. Audet observed that during testing Mr. Radel had some problems holding onto the pegs with his right hand and dropped several of them. AR64.

**F.      Disputed Fact**

The following fact was proposed by Mr. Radel and the bolded portion was disputed by the Commissioner:

The ALJ found Mr. Radel also alleged additional impairments, and the record showed Mr. Radel had received treatment or been evaluated for other symptoms and complaints, but stated that the alleged impairments "caused only transient and mild symptoms and limitations, are well controlled with treatment, have not met the 12-month-durational requirement, or are otherwise not adequately supported by the medical evidence in the record." AR14. The ALJ concluded "these alleged impairments do not constitute severe medically determinable impairments." AR14. The ALJ stated, "These include, but are not limited to, the following: polysubstance abuse (in remission)." AR14. **The ALJ never identified what other alleged impairments she was talking about. AR14.**

**DISCUSSION**

## A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Biestek v. Berryhill</u>, 589 U.S. ___, 139 S. Ct. 1148, 1154 (2019); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion.  <u>Biestek</u>, 139 S. Ct. at 1154; <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  <u>Minor</u>, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v.</u>

20

Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[6] The impairment must be severe, making the claimant unable to do his previous

---

[6] Although Mr. Radel has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only one set of regulations where the corresponding regulations are identical. It is understood that both Titles are applicable to Mr. Radel's application. Any divergence between the regulations for either Title will be noted.

work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

**Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C. **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.      The Parties' Positions**

Mr. Radel asserts the Commissioner erred in three ways: (1) the ALJ failed to identify all of Mr. Radel's medically determinable impairments and determine their severity; (2) the ALJ formulated an RFC not supported by substantial evidence in the record; and (3) the ALJ failed to identify occupations Mr. Radel could perform based on substantial evidence.  Mr. Radel asks for a decision reversing the Commissioner's decision below.  See Docket No. 13.  The Commissioner asks the court to affirm the decision below and asserts that each step of the sequential analysis is supported by substantial evidence in the record.  See Docket No. 16.

**E.      Step Two—Did the ALJ Identify All Medically-Determinable Impairments?**

At step two, the ALJ must identify all impairments that are medically determinable[7] and then the ALJ must determine whether those impairments are severe.[8]  See 20 C.F.R. §§ 404.1520, 404.1521, 404.1522, & 404.1523.  This is important for purposes of formulating RFC at step four.  At step four, the ALJ must consider the impact of *all* medically-determinable impairments

---

[7] An impairment is medically determinable if an acceptable medical source determines the claimant has an anatomical, physiological, or psychological abnormality shown by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1521.

[8] An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding and carrying out simple instructions, using judgment, responding appropriately to supervision and co-workers in usual work situations, and adjusting to changes in a routine work setting.  20 C.F.R. § 404.1522.

on the claimant's ability to function, whether or not an impairment is severe.

Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001); Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Therefore, if an ALJ finds an impairment to be medically determinable but non-severe at step two, that impairment does not just drop from any future consideration.  Instead, the impact of that impairment on the claimant's functioning must still be considered when determining the claimant's RFC.  Lauer, 245 F.3d at 703; SSR 96-8p.

Here, Mr. Radel argues the ALJ's step two analysis frustrates judicial review.  As to non-severe impairments, the ALJ stated the following:

> The claimant alleged additional impairments and the record shows they [sic] has been treated or evaluated for other symptoms and complaints that appear periodically throughout the record.  However, these alleged impairments, considered singly or together, have caused only transient and mild symptoms and limitations, are well controlled with treatment, have not met the 12-month-durational requirement, or are otherwise not adequately supported in the record.  Accordingly, these alleged impairments do not constitute severe medically determinable impairments (20 C.F.R. 404.1545 and 416.945).  These include, but are not limited to, the following:  polysubstance abuse (in remission).  The claimant testified he has been sober for two years and is enjoying sobriety.

AR14.

Mr. Radel asserts that the above (probably boilerplate) passage from the ALJ's opinion obfuscates the ALJ's analysis.  Besides polysubstance abuse, the reader cannot discern what other impairments were considered by the ALJ.  Furthermore, as to those unknown other impairments, the reader cannot discern whether the ALJ found the impairments were not medically determinable, or *were* medically determinable but nonsevere.  Mr. Radel

asserts the AR shows there were other impairments alleged such as headaches, impulsivity, and anger. He argues one cannot determine whether the ALJ considered each or any of these other alleged impairments and, if so, what the rationale was for rejecting them as severe, medically-determinable impairments.

The Commissioner counters that a closer examination of the record reveals no accepted medical source ever diagnosed Mr. Radel with headaches as a medically-determinable impairment shown by medically acceptable techniques. In fact, the Commissioner asserts Mr. Radel's medical records demonstrate he complained of headaches to a medical care provider on only one occasion and, on that occasion, told the doctor his headaches were readily controlled by over-the-counter medications such as ibuprofen.

Regarding Mr. Radel's assertion of anger and impulsivity, the Commissioner argues the medical records establish that those are symptoms of Mr. Radel's traumatic brain injury ("TBI"), not separate impairments, and the symptoms were well controlled by medication except for a brief period when Mr. Radel was not compliant with taking his medications. Because the ALJ found Mr. Radel's TBI to be a severe impairment at step two, the Commissioner asserts Mr. Radel's anger and impulsivity were also considered at step two and found to be part of the severe impairment of TBI. The Commissioner asserts it is Mr. Radel's burden at step two to establish his headaches, impulsivity, and anger are separate, medically-determinable impairments. The Commissioner believes Mr. Radel has not carried that burden.

Mr. Radel rejects the Commissioner's arguments regarding his headache, anger and impulsivity impairments. He states in reply he mentioned those impairments in his brief merely as "possibilities," but indicates there may be other impairments "masked" by the vague and conclusory language in the ALJ's opinion. Mr. Radel would have the court reverse simply because the ALJ used vague and conclusory language, without any showing of an impairment that should have been considered and was not.

The court declines Mr. Radel's invitation to engage in a fishing expedition, sifting through the AR to determine if there are any impairments other than the headaches, anger or impulsivity which he mentioned as "possibilities." Ultimately, Mr. Radel must identify what impairments he believes were left out at step two, and explain how or why those impairments ultimately have consequence to the RFC at step four.

If the ALJ failed to specifically mention a potential impairment, and that impairment is not medically determinable, such error would be harmless and would not require reversal and remand. Only medically determinable impairments, severe and non-severe, are considered in formulating RFC. Lauer, 245 F.3d at 703; SSR 96-8p. The burden is on Mr. Radel to show what impairment(s) the ALJ should have and failed to consider and why that has any effect on the five-step analysis.

The court agrees with the Commissioner that Mr. Radel's asserted headaches were not a medically determinable impairment. Therefore, any failure of the ALJ to specifically identify that impairment at step two and

discuss it is harmless error.  Headaches would not have been considered in formulating RFC because they are not a medically-determinable impairment. SSR 96-8p.

The court also agrees with the Commissioner's analysis of Mr. Radel's asserted anger and impulsivity—these were symptoms of Mr. Radel's TBI and, in discussing Mr. Radel's TBI, the ALJ *did* take into account that impairment at step two and subsequent steps.  Because in formulating the RFC the ALJ took anger and impulsivity into account—as part of Mr. Radel's TBI—the error, if any, in not separately discussing anger and impulsivity at step two is harmless.  Lund v. Colvin, 2014 WL 1153508 at *26 (D. Minn. Mar. 21, 2014) (stating "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC."). The court rejects Mr. Radel's argument that the error by the ALJ at step two, if any, requires reversal.

## F.    Step Four—Did the ALJ Properly Determine Mr. Radel's RFC?

Mr. Radel argues the ALJ's RFC formulation is not supported by substantial evidence in the record as a whole for two reasons:  (1) if the ALJ had considered the new and material evidence submitted to the Appeals Council, the ALJ would have limited Mr. Radel's use of his right arm and hand to a greater extent in the physical RFC; and  (2) the ALJ formulated Mr. Radel's mental RFC without benefit of any medical evidence.

1.    **Standard Applicable to RFC**

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer, 245 F.3d at 703 (cleaned up).    "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical (medically determinable) impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; SSR 96-8p.  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[9]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of

_____

[9] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every

reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2. Consideration of New and Material Evidence Relating to Mr. Radel's Right Arm and Hand

If new evidence is submitted to the Appeals Council on review, if the Appeals Council considered the new evidence but declined to grant review, the evidence becomes part of the administrative record. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). The task for the reviewing court then becomes consideration of whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence that was not before the ALJ. Cunningham,

222 F.3d at 500; Makey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995); Riley, 18 F.3d at 622. To a certain extent, this requires the court to speculate how the ALJ would have weighed the evidence had they been part of the record at the time of the hearing. Riley, 18 F.3d at 622.

But a reviewing court need only consider post-hearing evidence which is "new" and "material." Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995). The claimant must show the evidence to be "new" and "material" and relate to the period before the ALJ's decision.[10] Id. See also 20 C.F.R. § 404.970(b).

"New" evidence is, of course, evidence not previously in the record, but in order to be "new," the evidence also must not be merely cumulative of evidence that *is* already in the record. Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). The date on a medical record or opinion is not determinative of whether it is "material." Rather, regardless of the date the document was created, the question is: does it relate to conditions that existed in the period before the ALJ issued its decision? Cunningham, 222 F.3d at 502; Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990). If the record addresses a condition which came about after the ALJ hearing, or addresses a post-hearing deterioration of a pre-existing condition, it is not material; if it addresses a

---

[10] The Mackey court also required the claimant to show "good cause" for failing to introduce the evidence before the ALJ. Mackey, 47 F.3d at 952. However, in Mackey, the evidence was presented directly to the district court for the first time; it had never been presented to the ALJ or to the Appeals Council below. Id. at 951-52. For such circumstances, the "good cause" requirement applies. Id. However, where the claimant presented the new evidence to the Appeals Council after the ALJ hearing, "good cause" is not required when judicial review of the agency's decision is conducted. See Box v. Shalala, 52 F.3d 168, 171 n.4 (8th Cir. 1995).

condition which existed prior to the ALJ hearing, it is material. Bergmann, 207 F.3d at 1069-70; Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).

Here, Mr. Radel submitted evidence to the Appeals Council regarding the results of the Purdue Pegboard Test, administered to Mr. Radel by Thomas Audet, a Certified Rehabilitation Counselor who, as a vocational expert, testified extensively for the Commissioner at ALJ hearings. AR64-69. The test measures manual dexterity and bimanual coordination of the upper extremities; Mr. Radel scored in the bottom first or second percentile in all parts of the test, which was well below average. AR64. Mr. Audet opined that Mr. Radel would not be competitive in performing assembly or work tasks that involve manual dexterity, bimanual coordination, and fine finger dexterity. AR64. Mr. Audet reported that, during the test, Mr. Radel had problems holding onto the pegs with his right hand and dropped several of the pegs. Id.

Mr. Radel asserts if the ALJ had the benefit of Mr. Audet's evidence, the ALJ would not have formulated a physical RFC opining Mr. Radel could lift and carry 50 pounds occasionally and 25 pounds frequently (without differentiating between left and right upper extremities); the ALJ would not have opined Mr. Radel could frequently push and/or pull with the right upper extremity; and the ALJ would not have opined he could reach overhead and handle and finger with his right non-dominant upper extremity. AR16.

The Commissioner rejects the pegboard test, arguing that it is not "material" because it was a test administered outside the relevant period

(October 1, 2015, to August 28, 2018), and Mr. Audet did not give a medical opinion that related the test results back to the relevant period. Thus, the Commissioner argues the pegboard test shows Mr. Radel's manual dexterity as of October 11, 2018, but there is no evidence the test is indicative of Mr. Radel's manual dexterity between October 1, 2015, and August 28, 2018.

The court rejects the Commissioner's argument. As stated above, the date on a test is not determinative of materiality. The question is: does it relate to conditions that existed in the period before the ALJ issued its decision? Cunningham, 222 F.3d at 502; Williams, 905 F.2d at 216. If the record addresses a condition which came about after the ALJ hearing, or addresses a post-hearing deterioration of a pre-existing condition, it is not material; if it addresses a condition which existed prior to the ALJ hearing, it is material. Bergmann, 207 F.3d at 1069-70; Jones, 122 F.3d at 1154; Thomas, 928 F.2d at 260.

Here, Mr. Radel's right arm shortening, missing two right fingers, restricted mobility of the remaining three fingers on his right hand, and reduced grip strength result from a congenital abnormality he has had all his life. Thus, the condition existed before the "relevant period," during the "relevant period," and after the "relevant period." There is no evidence that Mr. Radel's right upper extremity condition changed during any of these times. Therefore, the court concludes the evidence is both "new" and "material." The court accordingly considers the evidence and evaluates whether the ALJ's decision is supported by substantial evidence in the record as a whole,

including the new evidence that was not before the ALJ.  Cunningham, 222

F.3d at 500; Mackey, 47 F.3d at 952; Riley, 18 F.3d at 622.

On this score, the Commissioner argues that Mr. Radel worked for a

single employer for 14 years as a dump truck driver, performed some part-time

work as a fast-food worker, painter, tree trimmer, and home remodeler, and

plays bass guitar in a band, practicing daily despite his right upper extremity

impairment.  The Commissioner posits these activities, in addition to

Mr. Radel's lack of any record of seeking treatment for his right upper

extremity, show that Mr. Radel is not disabled.

But the question is not whether Mr. Radel can do nothing or whether he

can return to past jobs (the ALJ specifically found he could not return to past

relevant work—AR21).  Rather, the ALJ formulated a specific physical RFC for

Mr. Radel.  The question is whether that RFC is congruent with the medical

and other evidence concerning Mr. Radel's right upper extremity.

Mr. Radel testified he does not have a grip with his right hand.  AR81.  It

is about half the grip of a normal hand.  Id.  He testified he has difficulty

picking up tools and cannot pick up a soda can with his right hand.  Id.

Despite this, he testified he can lift 50 pounds and can button buttons.  AR82.

Around the home, he is able to vacuum, do dishes, mop the floor, and dust.

AR83.  He plays bass guitar in a band on most Saturday nights and practices

his music 30 minutes a day.  Id.

His dump truck driving job was for a single employer, Tom Kruger of

Kruger Excavating.  AR78.  Mr. Radel lost his job at Kruger after 14 years when

Tom Kruger, his wife, and then his son all passed away within a few months of one another and the company went out of business. Id. It appears from the record that Tom Kruger made special accommodations for Mr. Radel's impairments as he would sometimes have Mr. Radel perform yard work at Kruger's home such as picking weeds in the rose garden, jobs other Kruger employees were not given. AR78, 87. Also, when Mr. Radel would experience anger outbursts at Kruger, his employer would just send him home, but did not fire him. AR86. Mr. Radel initially met Tom Kruger when Mr. Radel was 16 and Kruger was coaching Mr. Radel's brother's football team. AR87. Tom Kruger hired Mr. Radel four or five years later when Mr. Radel applied to Kruger Excavating and Tom recognized him. Id.

After losing his job at Kruger, Mr. Radel tried working at Dollar Tree and Hardee's. AR77, 87-88. Mr. Radel quit the Dollar Tree job after four weeks when they told him he was not working stocking shelves fast enough. AR77, 88.

Mr. Radel quit working at Hardee's after four months because he could not keep up with the rapid pace of food orders. AR77, 88. During his Hardee's employment, he would get flustered when customers returned with issues about their order and Mr. Radel walked off the job four or five times due to anger. AR88. In addition, neither the Commissioner herein nor the ALJ suggest that Mr. Radel's work at either Hardee's or Dollar Tree was at the substantial gainful activity level. Generally, if a claimant does not do his work satisfactorily, it does not constitute SGA. 20 C.F.R. § 404.1573(b). Also, if a

claimant's earnings are below SGA level, that is a primary consideration by the Commissioner in determining whether the claimant worked at an SGA level. 20 C.F.R. § 404.1574(a)(1).  Mr. Radel's earnings from these jobs was not at the SGA level.  See AR236 (showing annual earnings for Mr. Radel in 2016 of $1,223.40; $593.60 for 2017; and 0 for 2018). [11]  The ALJ specifically so found.  AR13.

Mr. Radel also got a part-time job helping a guy put up sheet rock and paint.  AR79-80.  This job consisted of approximately 10-15 hours per week and the job ended when the homeowner ran out of money to pay for the work. AR80.  The ALJ did not determine whether this constituted substantial gainful activity.  Mr. Radel's parents otherwise support him financially.  AR76, 80.

The ALJ's RFC related to Mr. Radel's right upper extremity stated that he could lift 50 pounds occasionally and 25 pounds frequently.  AR16.  This comes straight from Mr. Radel's testimony at the hearing and is supported in the record for that reason.  In addition, Mr. Radel also told Dr. Nicholas VenOsdel at his consultative exam that he could lift up to 60 pounds.  AR489. Before this court, Mr. Radel takes issue with the fact that the ALJ did not differentiate between Mr. Radel's ability to lift with either arm.  The record discloses that Mr. Radel himself did not differentiate.  Presumably, he uses both arms in conjunction with one another in order to lift 50 pounds—and the ALJ's physical RFC did *not* conclude that Mr. Radel could lift 50 pounds with

---

[11] SGA for the years 2016-18 for non-blind individuals ranged from earnings of $1,820 per month to $1,970 per month.  See ssa.gov/oact/cola/sga.html.

his right arm alone or his left arm alone.  The ALJ's RFC formulation is not deficient because it did not differentiate Mr. Radel's ability to lift with his left and right arms.

The ALJ's RFC provided Mr. Radel could push and/or pull with his right upper extremity frequently and could occasionally reach overhead.  AR16. Mr. Radel's testimony at the hearing provides some support for this formulation.  Vacuuming and painting require a push/pull maneuver and Mr. Radel testified he could do both.  Hanging sheetrock and painting also require some overhead reaching, again, supported by Mr. Radel's testimony.  In addition, Mr. Radel told Dr. VenOsdel that he could sweep, mop, shop, and mow the lawn.  AR489.  All of these activities require pushing and/or pulling and, therefore, support the ALJ's RFC formulation for pushing/pulling.

The ALJ also opined Mr. Radel could handle and finger with his right upper extremity occasionally.  Occasionally means up to 1/3 of an 8-hour work day, or a little over 2.5 hours.  See SSR 83-10, *Glossary*, *Exertional Level,* 1. Mr. Radel's successful job driving dump truck did not appear to require handling and fingering (he drove a truck with automatic transmission) and the two unsuccessful job efforts—Dollar Tree and Hardee's—failed precisely because Mr. Radel could not handle and finger with dexterity or speed. Regarding his job hanging sheetrock and painting, Mr. Radel testified he could not hold tools with his right hand.

The pegboard evidence clearly rules out this level—occasional--of handling and fingering on a daily basis.  AR64-65.  Dr. VenOsdel's consultative

exam also provides no support for Mr. Radel being able to handle and finger for up to 1/3 of a normal work day. That exam revealed a significantly shorter right arm, only three digits on the right hand (including a thumb), significant stunting contractures and shortening of the fingers with clubbed fingernails. AR488-90. Dr. VenOsdel noted Mr. Radel could fully flex his three fingers, but could not fully extend them. AR490. The muscle bellies on the right upper extremity were significantly smaller than Mr. Radel's left upper extremity. Id.

Dr. VenOsdel noted the tendon on Mr. Radel's third digit on his right hand sometimes gets stuck and will freeze his finger in the open position. AR488. When this happens, Mr. Radel experiences great pain and difficulty flexing that finger. Id. Dr. VenOsdel noted Mr. Radel had difficulty pinching and picking up objects with his right hand. Id. Dr. VenOsdel noted Mr. Radel had grip strength of 5 out of 5 in both hands, but this says nothing about hand and finger *dexterity* needed for handling and fingering. AR490. Dr. VenOsdel summarized the exam he conducted confirmed objective findings of limitations related to shortening of his right upper extremity, decreased muscle mass of the right upper extremity, missing digits, and those digits were not fully functional. AR491. "The patient also had objective findings on exam today demonstrating that he has limitations in his ability to fine manipulate with his right hand." Id.

The only real evidence in the record that Mr. Radel can handle and finger with his right hand is the fact that he plays bass guitar. However, usually bass guitar is a rhythm instrument that merely provides a "beat." It does not

usually require intricate fast-moving notes and chord changes. In any event, the ALJ did not inquire or explore what kind of finger dexterity Mr. Radel employed in playing the bass guitar or whether Mr. Radel played the instrument right- or left-handed. This reference to Mr. Radel's 30-minute a day hobby is too slight a reed to determine he retained the functional capacity to handle and finger up to 1/3 of an 8-hour work day (more than 2.5 hours), day in and day out. The ALJ's fingering/handling RFC is not supported by substantial evidence in the record.

The Commissioner points out that Mr. Radel did not seek treatment for his right upper extremity during the relevant period. He in turn argues that such "lack of regular and continuing treatment" shows that Mr. Radel's arm was not a disabling condition. See Docket No. 16 at p. 14. This argument, in the context of this case, is cruel and misplaced. There is no treatment that will grow Mr. Radel's right arm longer. There is no treatment that will cause his right hand to spring forth two more fingers. There is zero evidence that his doctors recommended treatment for his right arm that Mr. Radel failed to follow. The Commissioner's own guidance provides that failure to seek treatment does not undermine an assertion of disability where treatment cannot clearly be expected to restore capacity. See SSR 82-59. The court rejects this argument by the Commissioner.

### 3. Evidence Supporting the ALJ's Mental RFC

In Mr. Radel's case, the ALJ rejected the state agency psychological assessments who found Mr. Radel had no severe mental impairments, giving

40

these opinions "little weight." AR21. The ALJ went on to find at step two that Mr. Radel suffered from the severe mental impairments of major depressive disorder, generalized anxiety disorder, and TBI. AR14. At step three, the ALJ determined these mental impairments imposed "moderate" restrictions on Mr. Radel's functioning. AR15. The ALJ then formulated a mental RFC, asserting that Mr. Radel could understand, remember and carry out short, simple instructions; that he could interact appropriately with coworkers and the general public occasionally; that he was able to respond appropriately to work pressures in a usual work setting; and that he was able to respond appropriately to changes in a routine work setting. AR16.

Mr. Radel asserts the ALJ never made evident what medical evidence, if any, it relied upon to formulate this mental RFC. No other medical opinions exist in the record concerning how Mr. Radel's severe mental impairments impact his functioning. The state agency psychologists, whose opinions the ALJ rejected, opined Mr. Radel's mental impairments imposed no, or only mild, functional limitations. AR107, 120, 133, & 146. Mr. Radel's own treating mental health professionals did not opine on his mental functioning. Mr. Radel asserts it was incumbent upon the ALJ, given these circumstances, to obtain a consultative examination to obtain a medical opinion about Mr. Radel's mental RFC or to recontact his treating medical sources and obtain an opinion from one of them.

The Commissioner responds that there need not be any one, single medical opinion supporting the ALJ's mental RFC, that RFC is ultimately an

administrative decision reserved to the Commissioner.  As long as the ALJ provides support for the RFC formulation, the absence of a specific medical opinion from a treating or examining physician is not required.  <u>See</u> Docket No. 16 at p. 13.  The Commissioner cites <u>Hensley v. Colvin</u>, 829 F.3d 926, 932 (8th Cir. 2016), and <u>Buford v. Colvin</u>, 824 F.3d 793 (8th Cir. 2016), in support of this argument.

As to Mr. Radel's suggestion the ALJ should have obtained a consultative exam regarding his mental RFC, the Commissioner argues the then-applicable regulation, 20 C.F.R. § 404.1520b, provides where evidence of disability is insufficient or inconsistent, the ALJ "may" obtain a consultative exam or recontact the claimant's treating source.  The use of the word "may," means the ALJ was not required to take these actions, according to the Commissioner.

The Commissioner also argues the record evidence shows that symptoms from Mr. Radel's mental impairments were well-controlled through medication.  According to the Commissioner, impairments that are well-controlled through medication are not disabling.  Finally, the Commissioner argues Mr. Radel's substantial work record at Kruger Excavating (14 years) shows his mental impairments, which have existed since an automobile accident at age 7, were not disabling.

In his reply brief, Mr. Radel distinguishes the <u>Henley</u> case by stating in <u>Henley</u>, there *was* medical evidence—in the form of a letter from the claimant's Veteran's Administration physician—regarding the results of an examination that touched on the claimant's ability to function.  Here, no such medical

evidence—in the form of a letter or otherwise—is in the record. Under such circumstances, Mr. Radel emphasizes the non-adversarial nature of disability proceedings and argues the ALJ had a duty to develop the record regarding his mental RFC in some way, either through ordering a consultative exam, through requesting an opinion from one of Mr. Radel's treating sources, or some other avenue.

In <u>Hensley</u>, the claimant sought reversal of the ALJ's RFC formulation because there was no medical opinion in the record specifically corresponding to the RFC. <u>Hensley</u>, 829 F.3d at 932. The court stated "there is no requirement that an RFC finding be supported by a specific medical opinion." <u>Id.</u> Hensley's VA treating physician was not allowed to fill out an assessment of Hensley's ability to perform work activities. <u>Id.</u> However, the VA physician did prepare a "to whom it may concern" letter summarizing his disability exam of Hensley. <u>Id.</u> The letter addressed each of Hensley's severe impairments. <u>Id.</u> The court held this letter, together with Hensley's VA treatment records, was sufficient to provide substantial evidence in the record supporting the ALJ's RFC formulation. <u>Id.</u> at 932, 934.

In <u>Buford</u>, Buford argued the ALJ's RFC was defective and the record was insufficiently developed because his own treatment records did not indicate the degree of his functional limitations due to his impairments. <u>Buford</u>, 824 F.3d at 795. Buford argued the ALJ was under a duty to obtain a consultative exam or to recontact Buford's doctors and obtain an opinion from them. <u>Id.</u> at 795, 797. The court rejected the argument because the ALJ's RFC

43

formulation was supported by opinions of functional limitations by state agency medical consultants and the ALJ expressly considered these medical source opinions.  Id. at 797.  In addition, Buford's treatment records did not contradict the state agency opinions.  Id. at 796-97.

Mr. Radel's case is distinguishable from both Hensley and Buford. Unlike Hensley, where there was at least a letter opinion from a treating physician as to Hensley's functional capacities, here, no treating physician of Mr. Radel's issued a letter or any other form of an opinion as to his mental RFC.  Unlike Buford, where the ALJ expressly relied upon the state agency consultants' RFC opinions, here, the ALJ rejected the mental RFC formulated by the state agency consulting psychologists.  Therefore, there really is not any medical evidence in the record of Mr. Radel's mental functioning.  Nor does a longitudinal examination of the record support the ALJ's mental RFC.

Mr. Radel's TBI originated from an automobile accident when he was 7 years old.  AR463.  Three people died in the accident and Mr. Radel and his brother survived.  Id.  Mr. Radel lost consciousness for 3.5 weeks and, afterward, never returned to his prior level of functioning.  Id.  He had to relearn how to walk and talk after the accident.  Id.  Post-TBI, Mr. Radel experienced periods of not being able to read, crying and laughing uncontrollably.  Id.  He also suffered outbursts of anger and impulsivity as a result of the TBI.  Id.

In 2014, Mr. Radel experienced the loss of his wife, who died from alcoholism.  Id.  Thereafter, he also lost his house when someone set fire to it.  Id.

In addition, the ALJ mischaracterized some of the evidence in the record. For example, the ALJ wrote regarding the ability to remember and follow instructions that Mr. Radel "did not report any difficulties with following directions with his numerous jobs mentioned in the record, including cooking at Hardee's."  AR15.  But Mr. Radel *did* report difficulties following directions at Hardee's—specifically, he testified at the ALJ hearing he would get flustered when customers brought back orders he had gotten wrong or had missing items.  AR88.  He testified it was not just that he couldn't keep up in terms of speed at Hardee's, but also that he had difficulties getting things right in the first place.  AR88-89.

The court also rejects the Commissioner's invitation to affirm the ALJ because Mr. Radel worked as a dump truck driver for 14 years for Kruger Excavating, thus allegedly demonstrating his mental impairments do not render him unable to function in a work environment.  There is significant evidence that Mr. Radel's mental impairments were specially accommodated by Kruger in a way that other work settings probably would not have.  Mr. Radel got his job because Tom Kruger recognized him as the older brother of a child he had coached in football.  AR87.  When Mr. Kruger did not have work for Mr. Radel to do because he could not perform it (such as cutting pipe and shoring up walls), Mr. Kruger would put Mr. Radel to work weeding

45

Mr. Kruger's rose beds, the type of jobs others employed by Kruger never did. AR87. When Mr. Radel experienced angry outbursts at work—4 or 5 such outbursts in a six-month period--Mr. Kruger would just send him home for the day instead of firing him. AR86. This was not a typical work environment and Mr. Radel's ability to work in it for 14 years, while commendable, does not demonstrate conclusively that his mental impairments pose no barrier to his employment with another employer.

The Commissioner's argument that Mr. Radel's mental impairments were well controlled by his medications. The ALJ wrote in its opinion "the claimant's records demonstrate his symptoms improved markedly from 2016 to 2018." AR19. This statement begs the question. Merely because at the end of the relevant period Mr. Radel's anger, impulsivity, depression and anxiety had improved, does not address the question whether he was disabled before that improvement. Mr. Radel asked for benefits beginning in October, 2015. The improvement the ALJ wrote about began in July, 2017, when Mr. Radel's doctor switched him from Depakote to Risperdal. AR18.

There is evidence in the record that Mr. Radel continued to experience angry, impulsive outbursts between October, 2015, and July, 2017. For example, after Mr. Radel's initial denial of benefits and after he had requested reconsideration, the state agency consultant called him to obtain further information. AR144. Mr. Radel called the consultant back the same day and gave the requested information. Id.

Then, three days later Mr. Radel received a letter in the mail stating he must call the consultant.  Id.  Mr. Radel called the consultant back and got his voicemail.  Id.  He was extremely rude and left a message saying, "I'm doing my part by calling but you don't do your part by answering the phone so you better not deny my disability claim."  Id.  He reiterated his assertion the state agency consultant was "not doing [his] job by answering the phone."  Id.  Mr. Radel then stated "I already gave you information and everything you need so I don't know what else you could possibly need."  AR145.  Mr. Radel ended the phone call by stating "you better call me back."  Id.  The consultant wrote that he could hear Mr. Radel's mother in the background of the voicemail and she was very upset.  AR144.

Even the ALJ noted Mr. Radel has numerous inappropriate angry outbursts in the relevant period of time before his doctor switched his medications in July, 2017.  AR17-18.  These incidents included being angry for most of a week when visitors who were staying with him used his dishes.  AR17.  He was ordered by the court in connection with criminal proceedings to attend anger management classes in 2016.  AR18.  He was started on Depakote and Celexa in spring and early summer, 2016.  AR17-18.  While still in jail and taking 500 mg of Depakote per day, in July, 2016, Mr. Radel had an altercation with other inmates that resulted in him being locked down for two days and then moved to a different cell block.  AR451.  His Depakote dose was increased to 750 mg at this time.  Id.

In November, 2016, Mr. Radel was living at a half-way house and reported arguing with his roommates. AR18. In February, 2017, his Depakote dose was returned to the 500-mg level because of excessive daytime drowsiness. AR495-97. In May, 2017, he was kicked out of his court-ordered anger management classes because he had an angry outburst during a meeting. AR534. During the same visit, he reported an angry argument with his parents. Id. He also reported an angry argument with police at his friend's house. Id. These actions all occurred within the relevant time period and span the required 12-month durational requirement, yet the ALJ did not address whether Mr. Radel was disabled during any time frame prior to July, 2017, after which Risperdal appears to have greatly improved his mental functioning.

The ALJ cited to Dr. VenOsdel's consultative exam in which he stated Mr. Radel's TBI and depression did not impair his functioning and that he was normal in respect to his mental functioning. But this was a one-time, one-day evaluation. Mental impairments—Mr. Radel's mental impairments specifically—do not manifest symptoms every minute of every day. They wax and wane. Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016) (ALJ erred by not acknowledging that claimant's mental symptoms waxed and waned throughout the relevant period).

Furthermore, Dr. VenOsdel's report does not reveal any specialized mental functioning testing done by him on the occasion of his consultative exam of Mr. Radel. AR488-94. Even if Dr. VenOsdel was qualified to opine about Mr. Radel's mental functioning on the basis of his exam, it merely shows

that Mr. Radel's mental impairments did not interfere with his mental functioning on the one day of the consultative exam. That fact does not negate the longitudinal record of Mr. Radel's mental impairments.

The court returns to the issue presented: by giving "little weight" to the mental RFC opined by the state agency psychologists, and there being no other medical source opinion in the record on Mr. Radel's mental RFC, did the ALJ err in arriving at the mental RFC it formulated? The answer is "yes." The ALJ failed to consider whether Mr. Radel was disabled prior to beginning the drug Risperdal. The ALJ did not consider the longitudinal record of Mr. Radel's mental impairments, focusing instead on how well he was doing immediately before the ALJ hearing. The ALJ did not consider the waxing-waning nature of Mr. Radel's mental impairments. The ALJ did not consider the special circumstances attending Mr. Radel's job as a dump truck driver while working for Kruger Excavating. And the ALJ seemingly characterized Mr. Radel's work attempts at Hardee's and Dollar Tree as successful ventures into the world of work which demonstrated his mental ability to function at a job 40 hours a week, while the evidence shows those job attempts were anything but successful.

The court remands for the ALJ to re-evaluate the evidence and reconsider its conclusions about whether and to what extent Mr. Radel's mental impairments affected his mental functioning during the *entire* relevant period, not just at the end of that period.

Mr. Radel asks the court to require the ALJ upon remand to obtain a consultative exam or to recontact his treating sources. The ALJ has a duty to develop the record and to obtain evidence if it does not appear in the record as to crucial issues such as Mr. Radel's mental functioning. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011); Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). This is true even if a claimant is represented by counsel. Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010).

But the ALJ has numerous options in determining how to develop the record—obtaining a consultative exam and contacting a claimant's treating sources are just two of the possible avenues for developing the record. See 20 C.F.R. § 404.1519a. The regulation is phrased using the permissive word "may." Id. The court encourages the ALJ upon remand to consider the most appropriate avenue for developing the record of Mr. Radel's mental functioning, but will not order any specific action in that regard, leaving the exact method up to the ALJ's discretion.

## G. Step Five—Did the ALJ Properly Identify Occupations Mr. Radel Could Perform?

Mr. Radel asserts there is a conflict between the ALJ's physical RFC and the job of "laundry worker" identified by the VE as a job Mr. Radel could do. The ALJ limited Mr. Radel in the hypothetical to only occasional handling and fingering with his right arm and hand, while the job of laundry worker requires

frequent reaching and handling.[12]  Neither the ALJ nor the VE explained this discrepancy in the record.

Mr. Radel also asserts there is a conflict between the ALJ's RFC and the jobs of usher and page.  The ALJ limited Mr. Radel to only occasional interaction with coworkers and the general public, while the jobs of both usher and page require frequent talking and hearing in relation to other people.

Finally, Mr. Radel notes that the ALJ limited his RFC to jobs involving short, simple instructions, while the job of page requires a GED level 3, which is clearly much more than the ability to follow short, simple instructions.  The jobs of laundry worker and usher require a GED level 2, which Mr. Radel asserts may also exceed the mental RFC formulated for him by the ALJ.  Again, neither the ALJ nor the VE resolved this conflict on the record.

The Commissioner effectively concedes Mr. Radel's argument with regard to the jobs of page and usher as he makes no attempt in his responsive brief to demonstrate that the ALJ's decision was supported by substantial evidence regarding these two jobs.  <u>See</u> Docket No. 16 at p. 23.  However, the Commissioner urges the court to affirm the ALJ's step five decision based on the laundry worker job.  The Commissioner argues the VE's testimony adequately supports Mr. Radel's ability to do this job because the job requires

---

[12] The VE stated the job of laundry worker was DOT #361.685-010, but that DOT number actually corresponds to the job of "conditioner-tumbler operator." The actual DOT number for laundry worker is DOT #361.685-018.  Both jobs require frequent reaching and handling with both upper extremities.

no more than occasional overhead reaching, handling, and fingering with his right upper extremity.

The court need not resolve this argument as to whether the laundry worker job was consistent with the ALJ's physical RFC. The court has found that the ALJ's physical RFC as to handling and fingering was not supported by substantial evidence in the record as a whole. This case will be remanded for the ALJ to reconsider all the evidence, including the pegboard test evidence, and to reformulate Mr. Radel's physical RFC. Also, the court is remanding for reconsideration of the mental RFC. On remand, the court encourages the ALJ to make clear when formulating Mr. Radel's mental RFC whether he can perform jobs at the GED Level 1 or Level 2. After reconsideration by the ALJ on both physical and mental RFC, the new RFC may be different from the old formulation and may require new VE testimony as to jobs available in the national economy which Mr. Radel is capable of performing.

## H.  Claimant's Credibility

In the conclusion of Mr. Radel's initial brief in support of remand, he asks the court to remand with instructions "to reassess Radel's testimony and credibility." See Docket No. 14 at p. 19, item (3). Nowhere in Mr. Radel's briefing does he address Polaski[13] or the ALJ's credibility determination of Mr. Radel's testimony and his reports of functional limitations. Id. at pp. 1-19. Indeed, a large reason supporting the ALJ's physical RFC is that the ALJ

---

[13] Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

*credited* Mr. Radel's testimony that he could lift 50 pounds, mow the lawn, vacuum, drive a car, etc.

The court assumes item (3) in Mr. Radel's conclusion is a vestige of some earlier document that should have been deleted and was not. If item number (3) is not a mistake or typographical error, the court denies remand on this ground for the reason that Mr. Radel did not support the ground in his briefing with discussion, citation to the record, and legal supporting authority.

## I.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Radel requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213

F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED December 18, 2019.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge